In re EXPRESS LIQUORS, INC., Debtor.

Michael J. SCHWARZ, Trustee, Plaintiff,

v.

EQUITABLE BANK, N.A., formerly known as Equitable Trust Company, Suburban Bank, formerly known as Suburban Trust Company, and now known as Sovran Bank/Maryland Jin-Mar, Inc., Albert R. Martin, Cosinia Martin, and Jin Hwi Kim, Defendants.

Bankruptcy No. 81–1–1675.
Adv. No. 83–0858A.

United States Bankruptcy Court, D. Maryland, at Rockville.

Oct. 17, 1986.

Edward C. Dolan and Jeanne M. Crouse, Bethesda, Md., for Suburban.

Nelson C. Cohen, Bethesda, Md., for Jin-Mar, Inc., Albert R. Martin, Cosinia Martin, and Jin Hwi Kim.

James M. Greenan, Landover, Md., for third party defendants Steuart.

Steven M. Pavsner, Hyattsville, Md., for third party defendant Roebuck.

Gary R. Greenblatt, Baltimore, Md., for Michael J. Schwarz, trustee, plaintiff.

Timothy L. Mullin, Jr., and Mark D. Gately, Baltimore, Md., for Equitable.

## MEMORANDUM OPINION

A. THOMAS SMALL,[*] Bankruptcy Judge.

This is an adversary proceeding brought by Michael J. Schwarz, Trustee for Express Liquors, Inc., a chapter 7 debtor, to recover payments received by Equitable Bank, N.A., ("Equitable"), and Suburban Bank ("Suburban"), predecessor to Sovran Bank/Maryland, arising from the sale of the debtor's business to Jin-Mar, Inc., Albert R. Martin, Cosinia Martin, and Jin Hwi Kim, ("Buyers").

The trustee's complaint contains thirteen (13) counts which are based on several of the trustee's avoiding powers. Count I alleges an avoidable postbankruptcy transfer of the debtor's assets under 11 U.S.C. § 549 which the trustee seeks to recover under 11 U.S.C. § 550—Count I asks for a recovery from Equitable, Suburban, and the Buyers of $276,537.12. Counts II, III, V, and VIII allege preferential transfers under 11 U.S.C. § 547(b)(4)(A) which the trustee seeks to recover under 11 U.S.C. § 550—Counts II and III ask for $276,-537.12 from the Buyers, Equitable, and Suburban for transfers to Equitable and Suburban arising from the sale of the debtor's assets to the Buyers; Count V asks for $166,921.85 from the Buyers, Equitable, and Suburban; and Count VIII asks for $127,287.12 from Equitable only. Counts IV and VI are based on 11 U.S.C. §§ 547(b)(4)(B) and 550 and involve preferential transfers to Equitable and Suburban as "insiders"—Count IV asks for $276,-537.12 from the Buyers, Equitable, and Suburban; and Count VI asks for $127,-287.12 from Equitable and $58,500 from Suburban. Count VII seeks a determination that a liquor license, a lease, and a security interest are property of the estate and requests a turnover order under 11 U.S.C. § 542 against Equitable to require the return of those assets (liquor license,

* United States Bankruptcy Judge for the Eastern District of North Carolina sitting by designation.

lease and security interest). Count IX seeks recovery of a fraudulent transfer under 11 U.S.C. §§ 548 and 550 from Equitable ($167,958.60) and Suburban ($58,500.00). Count X is based on the Maryland Uniform Commercial Code—Bulk Transfers (*MD.COM.LAW CODE ANN.* §§ 6–101 *et seq.* (1975)) and seeks to avoid a transfer of the debtor's assets to the Buyers and to recover the amount of $276,537.12 from the Buyers, Equitable, and Suburban. Counts XI, XII, and XIII are based on 11 U.S.C. §§ 544(b) and 550 and three different Maryland statutes—Count XI alleges the failure to comply with the Maryland Uniform Commercial Code—Bulk Sales (*MD.COM.LAW CODE ANN.* §§ 6–101 *et seq.* (1975)) and asks for a recovery from the Buyers, Equitable, and Suburban of $276,537.12; Count XII is based on the Maryland Fraudulent Conveyance Statute (*MD.COM.LAW CODE ANN.* §§ 15–201 to 15–214 (1983)), and seeks to set aside the sale of the debtor's assets to the Buyers and to recover $276,537.12 from the Buyers, Equitable, and Suburban; and Count XIII is based on the Maryland Preference Statute (*MD.COM.LAW CODE ANN.* § 15–101 (Supp.1986)), and asks for a recovery of $276,537.12 from the Buyers, Equitable, and Suburban.

In addition to the causes of action brought by the trustee, the adversary proceeding also involves crossclaims and a third party complaint. The Buyers crossclaimed against Equitable and Suburban; this crossclaim was voluntarily dismissed at the conclusion of the proceeding.

Suburban filed a third party complaint against R. Calvert Steuart, Cynthia Steuart, John L. Oliverio, Jr., and Janice Oliverio (now Janice Roebuck) ("Third Party Defendants") based upon guarantees of the debts to Suburban which were allegedly paid by preferential payments. The Steuarts crossclaimed against the Buyers who responded with a counterclaim against the Steuarts. After the court announced its decision with respect to the trustee's claims, the Buyers and the Steuarts voluntarily dismissed the Steuarts' crossclaim and the Buyers' counterclaim. Janice Roebuck filed crossclaims against the other Third Party Defendants and the Buyers.

The trial was held in Rockville, Maryland, on October 6 and 7, 1986.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157, and Local Rule 51 of the United States District Court for the District of Maryland (effective April 1, 1985). The trustee's causes of action are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(E), (F), (H), and (*O*). The court also considers the related crossclaims and the counterclaims to be core proceedings as well since those causes of action have many overlapping factual issues, are closely related to the claims brought by the trustee, and are directly affected by the outcome of the trustee's proceeding.

## MOTIONS TO DISMISS PURSUANT TO BANKRUPTCY RULE 7041

At the close of the trustee's evidence, Equitable, joined by Suburban and the Buyers, moved to dismiss all counts of the trustee's complaint pursuant to Bankruptcy Rule 7041. The court allowed the motion as to Counts IV and VI (preferential transfers to "insiders"), Count X (failure to comply with the Maryland bulk sales law), and Count XI (§ 544(b) utilizing the Maryland bulk sales law), and Count XIII (§ 544(b) utilizing the Maryland preference law).

Specifically, with respect to Counts IV and VI there is no convincing evidence to support a finding that either the Buyers, Equitable, or Suburban are "insiders" as defined in 11 U.S.C. § 101(25).[1] The Buy-

---

**1.** The subsections of § 101 were renumbered by the Bankruptcy Amendments and Federal Judgeship Act of 1984, but those changes are only effective with respect to proceedings in cases filed after ninety days after the date of enactment (the enactment date is July 10, 1984). Pub.L. No. 98–353, § 553(a); 98 Stat. 333. Since the case in which this proceeding arises

ers were simply buying a business from the debtor, and Equitable and Suburban were proceeding as reasonable creditors doing what they could to collect a debt from a debtor who was in financial difficulty. The trustee conceded as much and did not object to the dismissal of Counts IV and VI.

Counts X and XI are based on the failure to comply with Maryland's bulk sales law in connection with the sale of the debtor's business to the Buyers. Count X is based entirely upon Maryland law without reference to 11 U.S.C. § 544(b). Section 6–111 of the Maryland Uniform Commercial Code—Bulk Sales states that no action shall be brought under that title more than six months after the date on which the transferee took possession of the goods unless the transfer has been concealed. The evidence is that the Buyers took possession of the property on September 4, 1981, and that the trustee's action was commenced on December 13, 1983. Since there is no evidence that the sale was concealed, the trustee's action was brought well beyond the six month limitation and should be barred by § 6–111. Judge Mannes, in ruling on the trustee's Motion for Summary Judgment reached the same conclusion (Memorandum of Decision, Docket No. # 92 pp. 10–11). Count XI was dismissed for the same reason.[2]

Count XIII is based on 11 U.S.C. § 544(b) and the Maryland preference law and was dismissed because, as conceded by the trustee, there is no evidence that there is a receiver or assignee for the benefit of creditors into whose shoes the trustee could step to take advantage of the Maryland preference law. Section 544(b) permits a trustee to assume the status of a real, not a hypothetical, creditor. Section 15–101(c)(2) of the Maryland Commercial Law Code allows a receiver or an assignee for the benefit of creditors to avoid preferential transfers made within four months of the commencement of the proceeding. There is no such receiver or assignee and Count XIII was therefore dismissed.

## FACTS

The basic facts are not disputed. Express Liquors, Inc., ("Express"), was a Maryland corporation operating a retail liquor store in the Marlton Shopping Center in Upper Marlboro, Maryland. The store was operated pursuant to a Beer, Wine and Liquor License, Class A (Off Sale) issued to John Oliverio, Jr. and Robert Calvert Steuart, Express Liquors' officers and shareholders (each owning 50% of the corporation).

Express maintained a checking account with Equitable which in the summer of 1981 was used by Mr. Oliverio as part of a check kiting scheme. In early August, Equitable uncovered the scheme and retained the law firm of Miles & Stockbridge to protect the bank's interests and to collect what amounted to a $167,958.60 overdraft in the Express account.

was commenced prior to the effective date of the amendments, the amendments do not apply to this proceeding. Although "insider" is defined in § 101(28) in the amended Bankruptcy Code, that definition was contained in § 101(25) prior to the amendments.

2. Count XI is based on 11 U.S.C. § 544(b) and the Maryland bulk sales law. In their trial memorandum Buyers cite the case of *In re Radcliffe's Warehouse Sales, Inc.,* 31 B.R. 827 (Bankr.W.D.WA 1983), as holding that a trustee using § 544(b) must bring a bulk sales action within the time limit set by the state bulk sales statute. The case does reach that conclusion, but the court in *Radcliffe's* does not consider the effect of § 546(a) which says that the trustee has two years from the time of appointment to bring an action under § 544. *See* 4 L. King,

*Collier on Bankruptcy* ¶ 544.03[2] at 544–22 (15th ed. 1986) and *Matter of Del Norte Depot, Inc.,* 716 F.2d 557, 561 (9th Cir.1983). If these latter authorities are correct, the court may have erroneously dismissed Count XI pursuant to Bankruptcy Rule 7041. There certainly is evidence that the Buyers did not comply with the bulk sales requirements (failure to respond to Request for Admissions # 12 through # 14) and had the court not been persuaded that the action was barred by the six month state statute of limitations, Count XI would not have been dismissed at the close of the trustee's evidence. The trustee's recovery in this adversary proceeding, however, would not be enhanced if he had prevailed on Count XI; nevertheless, Count XI could become a factor if this court's judgment were to be reversed or modified on appeal.

On August 7, 1981, Equitable filed suit against Express and Mr. Oliverio in the Circuit Court of Prince George's County, resulting in the issuance of a Writ of Attachment on the assets of the liquor store. The Sheriff served the Writ of Attachment on August 7, 1981, and, pursuant to the provisions of the writ, closed and secured the business.

As a consequence of the closing of the business, the continuation of the liquor license was jeopardized because of a 10–day maximum business interruption rule of the local liquor licensing authority. Express obtained a 20–day extension, but unless the business reopened within 30 days from August 7, 1981, the license would have been invalid.

After the attachment, Equitable and Express began negotiations concerning the satisfaction of the fraudulently incurred debt. Equitable agreed to consider releasing the attachment to permit a sale of Express's assets and to consider financing part of the purchase by an acceptable new operator. As a result of these negotiations, Express, through Mr. Steuart, actively sought a purchaser.

Several offers were received, but the only offer which was close to the $270,000 to $300,000 price which Mr. Steuart wanted was made by the Buyers (the Martins, Mr. Kim, and their corporation, Jin-Mar, Inc.). After an investigation of the Buyers' financial condition, Equitable agreed to finance a portion of the purchase price, provided that adequate security be given to Equitable for the loan, and provided that the Express overdraft, which had been reduced to $106,682.05, be paid from the sale proceeds.

Equitable, however, was not the only bank which wanted to receive part of the sale proceeds to pay a debt from Express. Suburban was owed $58,500 for two $30,-000 loans made to Express by Suburban in 1978—these loans having been guaranteed by the Third Party Defendants (Mr. Oliverio, Mrs. Oliverio (now Mrs. Roebuck), and Mr. and Mrs. Steuart). After negotiations among Express, Equitable, and Suburban, it was agreed that Suburban would receive $20,000 from the cash proceeds of the sale and that Suburban would allow the balance of its loan to be assumed by the Buyers.

The original understanding among Equitable, Suburban, Express, and the Buyers called for a closing on September 3, 1981, at which time the Buyers would pay $45,-000 of the purchase price in cash and finance $82,287.12 of the purchase price from a loan by Equitable. The $82,287.12 loan and the $45,000 cash were together just sufficient to pay Equitable's $106,-682.05 overdraft, $20,000 in cash to Suburban, and recording fees of $605.07. The balance of the purchase price was to be satisfied through assumption by the Buyers of other Express debts (including the balance of the debt to Suburban) and an additional cash payment of $60,000 upon the final settlement.

The parties met on September 3, 1981, but the Buyers did not bring the $45,000 cash "down payment." Equitable, however, agreed to increase its loan by $45,000 from $82,287.12 to $127,287.12 and the Buyers agreed to pay $45,000 to Equitable by September 19, 1981.

The meeting on September 3, 1981, lasted for eight and one-half hours and resulted in the execution of many documents in this complex and multifaceted transaction.

### Sale by Express to Buyers

The Agreement of Sale (Trustee's Exhibit # 1)[3] set out the basic sale terms between Express and the Buyers. The purchase price was $256,537.12,[4] to be paid by: 1) the Buyers "assuming a debt of the

---

3. The Agreement of Sale (Trustee's Exhibit # 1) is dated September 3, 1981, but there is some uncertainty as to when the agreement was signed. Trustee's Exhibit # 26 is virtually identical to Exhibit # 1 except that # 26 appears to be executed on October 8, 1981. The exact date that the agreement was signed does not affect the outcome of this proceeding.

4. The trustee's complaint and the Buyers' trial brief refer to the purchase price as being $276,-537.12, but that figure incorrectly counts the $20,000 payment to Suburban twice.

Seller (Express) in the amount of $127,-287.12" to Equitable—the Buyers were to execute a note in favor of Equitable which "provides for a down payment of $45,000 to be made on or before September 19, 1981" and which was to be secured by security agreements, guarantees, assignments, a mortgage, and a pledge agreement; 2) assumption by the Buyers of Express's $38,-500 debt (the balance after payment of $20,000) to Suburban; 3) assumption by the Buyers of a $30,750 debt to Audrey A. Dicken and Janis A. McClurkin (the former owners of the liquor store and the holders of a purchase money obligation from Express); and 4) $60,000 cash "at settlement."

It was essential that the liquor store begin operation prior to September 7, 1981, to preserve the license, but procedurally the license could not immediately be transferred to the Buyers. The solution to this dilemma was a Management Agreement which permitted the Buyers to operate the business for the benefit of Express. On September 4, 1981, the Buyers took control of the assets and opened for business in time to preserve the license. In November, 1981, the liquor license was formally transferred to the Buyers (*see* Martin Exhibit # 1), and the Buyers entered into an Amendment to Lease Agreement (Martin Exhibit # 3) with Express's landlord, Brandywine County Associates, which recognized the Buyers as the new tenant.

In November, then, the Buyers were the owners of the liquor license, were operating the store, and were recognized as the new tenant. However, before all of the components of the Sales Agreement could be accomplished, Express became a debtor under chapter 7 of the Bankruptcy Code by virtue of an involuntary petition filed on December 14, 1981.

Notwithstanding the bankruptcy petition, the Buyers and Express completed the Sales Agreement on January 26, 1982. At that time Express executed a Bill of Sale in favor of the Buyers, and the Buyers assumed the Suburban obligation by executing a note in the amount of $40,238.85, and also paid $31,756.37 in cash to Express (the $60,000 cash requirement had been reduced to $31,756.37 by cash payments made by the Buyers to satisfy some of Express's other creditors).[5] Subsequently, Express acceded to the entry of an order for relief which was entered on February 26, 1982.

The court finds that, with the exception of the assumption by the Buyers of Express's $40,238.85 obligation to Suburban, the Buyers paid full value for the assets purchased from the debtor. The Buyers had control of the assets and the store, owned the liquor license, and owned the lease before the bankruptcy petition was filed. All that remained under the Sales Agreement was the formality of delivering the Bill of Sale. In exchange, the Buyers made the agreed cash payment and executed a $40,238.85 note in favor of Suburban. The cash was eventually received by the trustee, but Suburban, and not the trustee, received the benefit of the $40,-238.85 promissory note.

### Suburban Transfers

There is no doubt as to the date of the transfers made to Suburban on account of its $58,500 antecedent debt—$20,000 was received by Suburban from Equitable on October 27, 1981 (*see* Suburban loan ledger; Trustee's Exhibit # 14), and the balance of the indebtedness was satisfied by the execution of the $40,238.85 note by the Buyers on January 26, 1982 (*see* Trustee's Exhibit # 14).[6]

Suburban contends that the loan payments it received were not property of the

---

5. The $31,756.37 cash payment was held by counsel for the debtor who paid the proceeds to the trustee. The payments for which the Buyers took credit (other than the payments to the taxing authorities) have been avoided as preferences by the trustee, and recovered for the estate.

6. Suburban continued to accrue interest on its loan to Express and the $40,238.85 amount includes interest charges.

debtor, but property of a third party—the Buyers. Both payments, however, were the direct result of the sale of the debtor's assets to the Buyers and the court finds that the payments were made from property of the debtor. The court also finds that Suburban gave no value for the $40,238.85 payment it received on January 26, 1982, after the filing of the involuntary bankruptcy petition (on December 14, 1981) except for the satisfaction of a debt that arose before the commencement of the debtor's case.

### Equitable Transfers

Whether the trustee may avoid the payment to Equitable depends upon when the transfer occurred—an issue which is the subject of considerable dispute. Equitable contends that it received the payment of the overdraft when the Buyers executed the $127,287.12 note payable to Equitable on September 3, 1981, more than ninety days before the filing of the involuntary petition. The trustee argues that the payments were received by Equitable in mid-October, 1981, within ninety days of Express's bankruptcy, when Equitable's books recognized the loan to the Buyers (October 21, 1981) and reflected the payment of the $106,682.05 overdraft (October 20, 22, and 26, 1981).

Mr. R. Frederick Marsden, the Equitable loan officer who handled the loan to the Buyers, testified that on September 3, 1981, he felt that the loan to the Buyers had been made and that the Express obligation had been satisfied. The $127,287.12 note which the Buyers executed on September 3, 1981, was unconditional and obligated the Buyers to pay Equitable $127,287.12 even if the Buyers were unable to obtain a transfer of the liquor license. In the event that the license could not be transferred, the Buyers' only relief was a grace period within which to pay the note, granted by a Contingent Moratorium Agreement (Trustee's Exhibit # 21).

The Buyers' credit had been approved by Equitable and the note was secured by a pledge of a promissory note held by the Buyers (Equitable Exhibit # 1) and by a mortgage on the Martins' home (Equitable Exhibit # 12). The note (Trustee's Exhibit # 19) was also secured by the assets of the liquor store. Specifically, Equitable received assignments of the liquor license from Mr. Oliverio and Mr. Steuart (Trustee's Exhibit # 6) and from the Buyers (Equitable Exhibit # 3), assignments of the lease from the debtor (Trustee's Exhibit # 7) and the Buyers (Equitable Exhibit # 4), and security agreements covering all of liquor store assets from the debtor (Trustee's Exhibit # 5) and the Buyers (Equitable Exhibit # 2). Financing statements were executed by the debtor, Mr. and Mrs. Martin, Jin-Mar, Inc., and Mr. Oliverio and Mr. Steuart (Trustee's Exhibits # 8–# 11 and Equitable Exhibits # 13–# 16), but for some unexplained reason the financing statements were not recorded in the Circuit Court for Prince George's County until September 16, 1981. There apparently is a letter dated September 4, 1981, in the files of Miles and Stockbridge which purports to transmit the financing statements to the Clerk of the Circuit Court of Prince George's County. The document was received into evidence (Equitable Exhibit # 27), but there is no other evidence to establish that the financing statements were sent on September 4, 1981, and the court makes no such finding. In any event, Equitable concedes that its security interests were not perfected under Maryland law until September 16, 1981. (See Equitable's Answer to Interrogatory # 6.)

Equitable argues that it obtained a valid attachment on all of the debtor's assets on August 7, 1981, which it would not have released unless it received a security interest in all of the debtor's assets and unless the overdraft was paid.

Equitable's own records, however, reflect that Equitable did not treat the loan to the Buyers as having been made until October 21, 1981. The records also show that the Express overdraft was not paid until October 20, 22, and 26, 1981. After considering all of the evidence, the court agrees with the trustee and finds that the payment to Equitable of the $106,682.05 overdraft was

made on October 20, 22, and 26, 1981, within ninety days of the debtor's involuntary bankruptcy petition.

That finding is based on several factors. Originally, the Buyers were to bring $45,000 in cash to the meeting on September 3, 1981, and Equitable was to make an $82,287.12 loan. Mr. Marsden had the authority to approve an $82,287.12 loan, but not one for $127,287.12. Mr. Marsden testified that the loan received the necessary approval on September 3, 1981, but there is no written evidence of such approval and the bank's internal records indicate that the loan committee approved the loan on September 22, 1981 (*see* Trustee's Exhibit # 25). Regardless of when the loan was approved, Equitable's commercial loan ledger (Trustee's Exhibit # 34) shows that the $127,287.12 loan to the Buyers was not recorded on Equitable's books until October 21, 1981. Two loan disbursal forms corroborate Equitable's ledger and show that the loan proceeds were not disbursed until October 21, 1981 (*see* Trustee's Exhibits # 31 and # 33). The ledger also shows that $45,000 was paid by the Buyers on that same date.

Equitable's checking account ledger for the Express account shows that $45,000 was credited to Express's account on October 20, 1981, that $61,717.57 was credited on October 22, 1981, and that $4,052.91 was credited on October 26, 1981. It was just a few days earlier that Equitable received two checks totalling $45,000 to be applied to the $127,287.12 note. It was not until after these funds were received that Equitable paid Suburban $20,000 (*see* Trustee's Exhibits # 29 and # 30), "booked" the loan, and satisfied the overdraft.

There are also other documents from Equitable's files which support a finding that payment of the overdraft was not made until October. A handwritten message by Mr. Marsden dated October 16, 1981, says that the checks received from the Buyers were "given to Frank Small to offset overdraft" (*see* Trustee's Exhibit # 28). Furthermore, in a memorandum (Trustee's Exhibit # 43) written almost two years later,

Mr. Marsden describes the loan to the Buyers as being for $82,287.12. While the face amount of the note was indeed $127,287.12, Mr. Marsden's description of the loan as being for $82,287.12 is a more accurate characterization of how Equitable handled the loan.

It is apparent to the court that Equitable's attorneys designed the transaction among Express, the Buyers, and Equitable to accomplish a payment of the Express overdraft on September 3, 1981. It is also apparent, however, that Equitable's personnel did not follow that plan and that the loan was not funded, and the payment of the overdraft did not occur, until mid-October, 1981.

Finally, with respect to the Equitable transfers, the court finds that the $605.07 received by Equitable (the sum included in the $127,287.12 note for closing costs) constitutes a transfer of an interest of the debtor in property (proceeds from the sale of the debtor's assets) for which the debtor received less than a reasonably equivalent value.

### Insolvency

The court finds that the debtor was insolvent on and during the ninety days immediately preceding the date of the filing of the petition. The Buyers, through cross-examination of the trustee and the testimony of Mr. Steuart, tried to show that had the trustee pursued a claim against Mr. Oliverio for the check kiting scheme, the estate would have been solvent. That evidence was at best highly speculative and was not at all convincing. Neither Equitable nor Suburban offered evidence to rebut the presumption of 11 U.S.C. § 547(f).

### Effect of Payments

The court finds that the $20,000 payment to Suburban and the $106,682.05 payment to Equitable enabled Suburban and Equitable to receive more than they would have received in a chapter 7 case had the payments not been received.

### DISCUSSION AND CONCLUSIONS

To be avoidable under 11 U.S.C. § 547(b), a transfer must be a "transfer of an inter-

est of the debtor in property." The argument that the payments to the banks were made from property other than property of the debtor has no merit. It is clear that the payments came from the proceeds to which the debtor was entitled from the sale of the debtor's assets to the Buyers.

From time immemorial courts of law have refused to sanction acts done by indirection which, if performed directly, would be barred by the law. The Code continues this policy. Although "transfer" is not defined in section 547(b), section 101(48) defines "transfer" to include "every mode, direct or indirect ... of disposing of ... property." While the original version of the Bankruptcy Act did not define a transfer in terms of direct or indirect transaction, courts of bankruptcy from the beginning placed emphasis upon the purpose and effect of a given transaction irrespective of the devious manner in which it was accomplished. Before long the principle became well established that a transfer, which indirectly evaded the provisions of the Act by effecting an undue preference to a creditor, was voidable. It was immaterial that the transfer was made to one or more persons other than the creditor as long as the object was to benefit the creditor and the effect was to evade the intent and purpose of the Bankruptcy Act.

4 L. King, *Collier on Bankruptcy* ¶ 547.09 at 547–39–40 (15th ed. 1986).

■ The $20,000 payment to Suburban and the $106,682.05 payment to Equitable

meet all the requirements of § 547(b).[7] The $20,000 payment to Suburban was a transfer for an antecedent debt ($58,500 loan balance plus interest) made (on October 27, 1981) within ninety days of bankruptcy (December 14, 1981) at a time when the debtor was insolvent which enabled Suburban to receive more than it would have received through distribution in a chapter 7 case.[8] The Equitable payment of $106,682.05 was a transfer for an antecedent debt ($106,682.05 overdraft) made (on October 20, 22, and 26, 1981) within ninety days of bankruptcy at a time when the debtor was insolvent which enabled Equitable to receive more than it would have received through distribution in a chapter 7 case.

Equitable contends that its payment is not preferential because the debt that was paid was secured by the debtor's assets. It is true that Equitable had a lien on Express's assets by virtue of the attachment and that, when the attachment was released, Equitable took a security interest in the assets to secure the note from the Buyers. Equitable, however, did not perfect the security interest until September 16, 1981, thirteen days after the security interest attached on September 3, 1981. Consequently, the perfection is outside the "grace period" of 11 U.S.C. § 547(e)(2), the security interest is avoidable under § 547(b), and Equitable's debt at the time of the $106,682.05 payment was unsecured.

7. Section 547(b) provides:
   Except as provided in subsection (c) of this section, the trustee may avoid any transfer of interest of the debtor in property—
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   (3) made while the debtor was insolvent;
   (4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

   (5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

8. The "receive more" than in a chapter 7 case requirement of § 547(b)(5) is satisfied when the estate is not paying 100% to all creditors. *In re Saco Local Development Corp.,* 30 B.R. 862 (Bankr.D.ME 1983) and *In re Zachman Homes, Inc.,* 40 B.R. 171 (Bankr.D.MN 1984).

Equitable argues that the "contemporaneous exchange" exception of § 547(c)(1)[9] protects the late perfection of the security interest. Several circuit court decisions which have considered this issue have held that perfection beyond the ten day grace period can not be rescued by § 547(c)(1). *In re Arnett*, 731 F.2d 358 (6th Cir.1984); *Matter of Tressler*, 771 F.2d 791 (3rd Cir. 1985); *Matter of Vance*, 721 F.2d 259 (9th Cir.1983). *See also In re Northwest Erection, Inc.*, 56 B.R. 612 (Bankr.D.Mont. 1986). For a criticism of the holdings in the *Vance* case, *see* Duncan, *Section 547(c)(1) and Delayed Perfection of Security Interests in the Ninth Circuit: In re Vance*, 721 F.2d 259 (9th Cir.1983), 58 Am.Bankr. L.J. 269 (1984). But even if § 547(c)(1) is available, Equitable has the burden of proving the exception—a burden which it did not carry.

Accordingly, the trustee should prevail under the remaining preference counts of the complaint (Counts II, III, V, and VIII (Count VIII as to Equitable only)) and recover, pursuant to § 550, $20,000 from Suburban and $106,682.05 from Equitable.

■ The trustee is also entitled to a recovery under Count I from Suburban for the $40,238.85 payment it received on January 26, 1982. This was a postbankruptcy transfer for which Suburban gave no new value. Suburban says that its forebearance from obtaining a judgment was value, but that is not the type of value required by § 549.[10] The only real value given by Suburban was satisfaction of Suburban's antecedent debt—a "value" which is specifically not recognized for purposes of § 549 when the transfer occurs before the petition and the order for relief. *See* § 549(b).

The court could permit the trustee to recover the $40,238.85 postbankruptcy transfer from the Buyers pursuant to § 550. As between Suburban and the Buyers, however, the loss should be borne by Suburban. The Buyers are obligated to repay Suburban under the $40,238.85 note; to make the Buyers pay $40,238.85 to the trustee would require them to make the payment twice. Since the trustee may have only one recovery, the court will order recovery from Suburban only and no judgment will be entered against the Buyers.

■ The payment to Equitable of $605.07 for closing costs resulted in no direct benefit to the debtor and was a transfer which is avoidable under 11 U.S.C. § 548(a)(2).[11] With the exception of that

---

9. Section 547(c)(1) provides:
   The trustee may not avoid under this section a transfer—
   (1) to the extent that such transfer was—
   (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
   (B) in fact a substantially contemporaneous exchange.

10. Section 549(a) and (b) provide:
   (a) Except as provided in subsections (b) or (c) [ (c) is not applicable in this proceeding] of this section, the trustee may avoid a transfer of property of the estate—
   (1) made after the commencement of the case; and
   (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
   (B) that is not authorized under this title or by the court.
   (b) In an involuntary case, a transfer that occurs after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

11. Section 548(a)(2) provides:
   (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

   . . . . .

   (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
   (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
   (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
   (iii) intended to incur, or believed that the debtor would incur, debts that would be be-

transfer, however, the sale of the debtor's assets was not a fraudulent transfer under § 548—the Buyers gave full value for the prepetition transfers; the banks also gave full value by satisfying antecedent debts. Consequently, the trustee will prevail against Equitable on Count IX only to the extent of $605.07. The same is true with respect to Count XII which is based on § 544(b) and Maryland's fraudulent conveyance law which is similar to § 548.[12]

There being no reason to disturb the transfer of the liquor store assets sold to the Buyers, "turnover" under Count VII would not be justified.

*Interest*

The trustee contends that he should recover prejudgment interest from Equitable and Suburban for the avoided transfer. The court agrees and will award prejudgment interest based on the postjudgment rate established by 28 U.S.C. § 1961 from December 13, 1983, the time that the adversary proceeding was commenced (there being no evidence to establish the time of demand). The rate in effect for postjudgment interest on federal judgments on December 13, 1983 was 9.93% which if compounded annually would be $18,656.97 for the sums owed by Suburban ($60,238.85) and $33,228.60 for the sums owed by Equitable ($107,287.12). *See In re The H.P. King Company, Inc.*, 64 B.R. 487 (Bankr. E.D.N.C.1986).

## THIRD PARTY CLAIMS

■ Suburban maintains that the liability of the Third Party Defendants (Mr. Oliverio, Mrs. Oliverio (Roebuck), and Mr. and Mrs. Steuart) on their original guarantees of Express's obligations to Suburban are revived by the avoidance of the payments which Suburban received.

There is no dispute that the Third Party Defendants originally guaranteed Suburban's loans to Equitable (Stipulation # 7 and Mr. Oliverio's default). The Steuarts, however, contend that their guarantees were replaced by a *new* guarantee covering the $40,238.85 note. The Steuarts argue that the new guarantee was a novation which completely nullified their prior guarantees which were returned to the Steuarts (Stipulation # 9) at the time the $40,238.85 note was executed and when the Steuarts executed new guarantees.

There is no dispute as to the basic facts and both Suburban and the Steuarts moved for summary judgment. Ordinarily, whether there is a novation involves ascertaining the intent of the parties—not a good issue for summary judgment. Nevertheless, based upon the representations of counsel, the court is persuaded that no further evidence would be forthcoming at trial and the court will grant summary judgment in favor of the Steuarts and in favor of Suburban as to third party defendants Oliverio and Roebuck. This court finds that the new guarantee did constitute a novation and was intended to replace all prior guarantees. The language of the new guarantee is clear and unequivocal— "This guarantee is expressly limited to the liability of Jin-Mar, Inc. on a note dated January 26, 1982." (*See* Affidavit of Cyril E. Maire, III.[13]) If the parties had intended more, the document could have called for expanded liability.

The general rule, as stated in the case of *In re Herman Cantor Corp.*, 15 B.R. 747, 750 (Bankr.E.D.VA 1981), is that the payment of a debt which is later set aside as a preference does not discharge a surety. The rule would certainly have been applied in this proceeding to the $20,000 payment received by Suburban had there not been a new guarantee. The bankruptcy petition

---

yond the debtor's ability to pay as such debts matured.

**12.** *MD.COM.LAW CODE ANN.* § 15–204 (1983) provides:

Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to credi-

tors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

**13.** The affidavit filed by Mr. Steuart was most likely intended to contain statements to the same effect, but the critical page (or pages) of the affidavit was not filed with the court.

had been filed and all parties should have recognized that the postbankruptcy transfer was vulnerable to an attack under 11 U.S.C. § 549 and that the prebankruptcy $20,000 payment was subject to being avoided as a preference. Nevertheless, Suburban proceeded to accept a *new* guarantee from the Steuarts which by its terms limited the guarantors' liability to the Jin-Mar, Inc. note. The limitation of liability certainly makes sense—otherwise the Steuarts could have found themselves liable on the Express debt on account of avoided payments *and* also liable on the Buyers' note. Accordingly, the general rule will not be applied as to the Steuarts, and judgment will be entered in their favor. However, judgment in the amount of the avoided payments ($60,238.85) will be entered against Mr. Oliverio and Mrs. Roebuck. Mrs. Roebuck did not pursue her cross-claims against the Buyers and the other third party defendants and those cross-claims will be dismissed.

