In re AGRICULTURAL RESEARCH
AND TECHNOLOGY GROUP, INC.,
a Hawaii corporation, Debtor.

Thomas E. HAYES, Trustee,
Plaintiff–Appellee,

v.

PALM SEEDLINGS PARTNERS–A, a
Hawaii limited partnership; Grant–
Buskett Management Corporation, in-
dividually and as general partner of the
partnership; Robert B. Grant; Ruth M.
Jasper, Trustee for the Ruth M. Jasper
Revocable Living Trust; Florine A.
Katz; Edwin Y.W. Fong; Nancy Foos;
Jerome O.C.C. Leong; Joseph C.C.
Leong; Lon D. Pierce; George A.
Reich; John F. Smith; Myron F. Teth-
al; Marian F. Townsend; Nancy R.
Weisner; and James W. Winters, indi-
vidually and as limited partners of said
partnership, Defendants–Appellants.

No. 89–15416.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 17, 1990.

Decided Oct. 9, 1990.

As Amended Dec. 5, 1990.

530

Fred Paul Benco and Darryl Miyahira, Honolulu, Hawaii, for defendants-appellants.

Simon Klevansky and Elizabeth A. Kane, Gelber and Gelber, Honolulu, Hawaii, for plaintiff-appellee.

Before ALARCON and POOLE, Circuit Judges, and WILLIAMS,* District Judge.

SPENCER WILLIAMS, District Judge:

The appellee, Thomas E. Hayes, is the bankruptcy trustee for the debtor Agricultural Research and Technology Group, Inc. ("Agretech"). He instituted this action against Palm Seedlings Partners-A ("Palm Seedlings-A"), its general partner Grant-Buskett Management Corporation ("Grant"), and its limited partners to avoid certain transfers from Agretech to Palm Seedlings-A, pursuant to 11 U.S.C. § 544(b), Haw.Rev.Stat. § 651C-4 and its common-law equivalent. We affirm.

## PROCEEDINGS AND DISPOSITION IN DISTRICT COURT

Creditors of Agretech filed a petition for its involuntary bankruptcy on September 26, 1986. The trustee of Agretech commenced this action on June 30, 1987, to avoid certain transfers from Agretech to Palm Seedlings Partners-A. In this action, the trustee sought recovery of funds from the following defendants-appellants: 1) Palm Seedlings-A; 2) Grant; and 3) from the limited partners of Palm Seedlings-A, for the amount of monies distributed respectively to each.

The district court found that Agretech transferred monies in fraud of its creditors to Palm Seedlings-A by means of a "Ponzi" scheme. A Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists. *See Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

The district court further found that Palm Seedlings-A was a transferee in bad faith. Accordingly, the district court avoided all transfers and ruled that the trustee could recover all monies from Palm Seedlings-A, and its general and limited partners. Because the district court determined that the transfer of funds from Agretech to Palm Seedlings-A greatly exceeded any value transferred from Palm Seedlings-A to Agretech, the district court alternatively ruled that the trustee could *at least* avoid and recover all transfers to the extent of the excess even if Palm Seedlings-A was not a transferee in bad faith.

Judgment was entered in favor of the trustee on September 15, 1988 for the full amount of all transfers and for prejudgment interest from the date the complaint was filed. The district court reserved for later determination whether prejudgment interest could be awarded from the date of the fraudulent transactions. Defendants moved for a reconsideration of the court's order granting plaintiff partial summary judgment.

After further briefing, the district court awarded prejudgment interest to the time of the transfers in question. A supplemental final judgment was entered on January 5, 1989, to reflect the additional prejudgment interest. The district court denied defendant's motion for reconsideration on February 22, 1989.

Judgment was entered pursuant to certification under Federal Rule of Civil Procedure 54(b). Therefore, the judgments entered did not dispose of all claims. Defen-

---

* The Honorable Spencer Williams, Senior United States District Judge for the Northern District of California, sitting by designation.

dants appealed from the final partial judgment, supplemental final partial judgment, and the orders denying reconsideration of final partial judgment and supplemental final partial judgment on March 22, 1989 and March 30, 1989, within the thirty day time limit prescribed by 28 U.S.C. § 2107.

## FACTS

Agretech was a Hawaii corporation engaged in the business of producing, cultivating and marketing tropical foliage plants. Its operation in this case, which appears to, but may not reflect its overall scheme, was to accept and cultivate seeds from investors. The investors guaranteed a certain germination rate, and made a cash advance to Agretech to cover its cultivation costs. In turn, Agretech agreed to purchase the germinated seeds (seedlings) from the investor at a predetermined time for a predetermined amount. The amount, which guaranteed the investor substantial return on his investment, was greatly in excess of the costs of production, and had no apparent realistic connection with the marketability or market value of the seedlings.

### Agency and Purchase Agreement With Palm Seedlings–A

On October 6, 1983, Agretech and Palm Seedlings–A agreed that Agretech would accept delivery in Honolulu of 8,000,000 "chamaedorea seifrizzi" (palm) seeds purchased by Palm Seedlings–A. Palm Seedlings–A paid $56,000.00 to a third-party seed broker for the seedlings. In return for Agretech's promise to cultivate and market the seedlings, Palm Seedlings–A agreed to advance Agretech $40,000.00 for anticipated cultivation expenses. The parties further agreed that Agretech would re-purchase the seedlings from Palm Seedlings–A for $225,000.00 fourteen months later.

The agreement was modified by an "Addendum" dated October 28, 1983, whereby Palm Seedlings–A was to purchase additional seedlings. Accordingly, the purchase price was increased to $229,000.00. Palm Seedlings–A also agreed to purchase additional seedlings if the germination rate fell below 65%, so that Agretech would be assured of a 65% germination rate with respect to the original quantity of seedlings purchased.

### First Transfer

In November of 1983, only one-half of the expected amount of seedlings arrived in Honolulu. Palm Seedlings–A transferred its outstanding credit balance with the seed broker to Agretech. However, Agretech was unable to obtain equivalent seeds from another source.

The parties eventually agreed to apply the remaining credit balance with the original seed broker to another shipment of seeds from that broker. The next shipment from the seed broker was expected on May 1, 1984. In view of these new circumstances, the parties decided that Agretech would purchase one-half of the seedlings in December of 1984, and the other half in June of 1985.

Not only did the first shipment of seeds arrive late, but they were damaged in transit as well. In January of 1984, Agretech informed Grant that only 4% of the seeds from the first shipment had germinated at Agretech's facility at Waiahole. Eight months after planting, Robert Grant, an officer of Grant, inspected these seeds and found that the germination rate was approximately 2.6%.

Despite the low germination rate, Grant demanded that Agretech fulfill its obligation to pay the first purchase price of $114,750.00 on December 15, 1984, as previously agreed. Grant informed Agretech that Grant was soliciting some Palm Seedlings–A limited partners to invest in another partnership, and that "timely payment to Palms [Seedlings]–A will help us to expedite the complete funding of Palms–E. Your cooperation will be much appreciated." Agretech paid the purchase price to Grant, although the value of the seedlings at the time approximately totalled only $5,200.00.

At the time of the first payment, Agretech had just received $5,000,000.00 in funds from another investor. Grant distributed Agretech's first payment to Palm

Seedlings–A. Palm Seedlings–A, in turn, distributed the transfer to its limited partners.

*Second Transfer*

Agretech made payment to Palm Seedlings–A for the first shipment on December 17, 1984, one day before the arrival of the second shipment. The second shipment of seedlings arrived December 18, 1984, seven months after the expected delivery date of May 1, 1984. Some time after December 19, 1984, Agretech planted these seeds at its Waimanalo facility.

Upon an inspection of these seedlings on March 20, 1985, Robert Grant observed that "very few" seeds had sprouted. Notwithstanding this low germination rate, Grant demanded that Agretech transfer the second payment on June 1, 1985, as agreed. As was the case with the first transfer, Grant explained to Agretech that Grant wanted to syndicate another partnership, and that "timely payment of the final installment to Palms [Seedlings]–A will help us to expedite the complete funding of Palms–F."

Unlike the first transfer, however, Grant explicitly acknowledged to its limited partners that "funds expected by them [Agretech] to be available for purchase of the Seifrizii seedlings owned by Palms–A have not come in as rapidly as they projected ..." Eight days after this letter, Grant remitted to Agretech a check for $114,750.00 on behalf of Palm Seedlings–F. However, Grant syndicated Palms Seedlings–F for the purchase of kentia, not seifrizzi, palms.

On the same day Agretech deposited this check into its bank account, it wrote a check on that same account for $114,750.00 in full satisfaction of the second payment. Once again, Palm Seedlings–A distributed this amount to its partners. Subsequent to the transfers in question, Richard Garcia, a former president of Agretech, plead guilty to a Ponzi scheme for the years 1985 and 1986, and acknowledged a similar pattern of transfers for the three preceding years.

## DISCUSSION

## I. STANDARDS OF REVIEW

### A. *Appellate Review*

This court reviews a district court's rulings on summary judgment motions *de novo*. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626 (9th Cir.1987). However, a district court's ruling on a motion for reconsideration is reviewed under an "abuse of discretion" standard. *McCarthy v. Mayo*, 827 F.2d 1310, 1314 (9th Cir. 1987). Similarly, a district court's award of prejudgment interest is reviewed to determine whether the district court abused its discretion. *Western Pacific Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1289 (9th Cir.1984).

### B. *Summary Judgment Standards*

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion ..." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party must point out why no genuine issue of material fact exists for trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. In meeting this burden, the moving party need not negate the opponent's claim. *Id.* at 323, 106 S.Ct. at 2552.

Once the moving party meets this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. In cases where the non-moving party bears the burden of proof at trial with respect to a material fact, the party opposing the motion is required "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. A mere scintilla of evidence is not sufficient to withstand the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

The question is therefore whether a reasonable jury could find that the party

which bears the evidentiary burden at trial with respect to a claim or defense proved its case "by the quality and quantity of evidence required by the governing law ..." *Id.* at 254, 106 S.Ct. at 2513. All reasonable inferences from the evidence are drawn in favor of the non-moving party. *Id.* at 255, 106 S.Ct. at 2513. However, the non-moving party must come forward with more persuasive evidence than necessary if the factual context makes the non-moving party's claim implausible. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

## II. PARTIAL SUMMARY JUDGMENT WITH RESPECT TO LIMITED PARTNERSHIP

### A. *Standards for Fraudulent Conveyances*

■ Pursuant to the Bankruptcy Code, 11 U.S.C. § 544(b), the bankruptcy trustee "may avoid any transfer ... that is voidable under applicable law by a creditor holding an unsecured claim ..." Section 550 of 11 U.S.C. further provides that the trustee may recover from the transferees or subsequent transferees all monies transferred in violation of applicable law. In seeking recovery of such monies, the trustee stands in the overshoes of the debtor corporation's unsecured creditors. *Schneider v. O'Neal*, 243 F.2d 914 (8th Cir.1957).

There are two overlapping bodies of law applicable to this case which permit the trustee to recover a fraudulent conveyance. The Statute of 13 Elizabeth I (1570) is the basis of common-law fraudulent conveyances, and forms part of the common law of Hawaii. *Achiles v. Cajigal*, 39 Haw. 493 (1952). This common law was incorporated into sections 4(a)(1) and 8 of the Uniform Fraudulent Transfer Act ("Uniform Act"). *See* Unif. Fraudulent Transfer Act, 7A U.L.A. 639 (1985).

■ Before the second transfer was effected, Hawaii adopted the Uniform Act on June 4, 1985, as Haw.Rev.Stat. §§ 651C–1 *et seq.* Because the transfers in question occurred more than one year previous to the filing of the bankruptcy petition on September 26, 1986, the analogous Bankruptcy Code sections do not apply. *See* 11 U.S.C. § 548. Although the Uniform Act and the common law thus provide the substantive law in this case, cases construing the Bankruptcy Code counterparts are persuasive authority due to the similarity of the laws in this area.

### 1. Two Theories of Recovery

■ The Uniform Act as adopted by Hawaii provides as follows:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Haw.Rev.Stat. § 651C–4(a); *see also* 11 U.S.C. § 548(a). Thus, there are two possible theories of recovery under applicable state law: 1) actual intent to defraud; and 2) reasonably equivalent value. Although Haw.Rev.Stat. § 651C–4(a)(1) requires a showing of actual intent, a successful trustee under this provision can avoid a transaction even if the debtor corporation was not insolvent at the time of the transaction.

■ As one court noted, "[a] court may make a finding of fraudulent intent under section 548(a)(1) [actual intent to defraud] on the basis of circumstantial evidence; direct proof ... will rarely be available." *In*

*re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983). For example, the debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme. *Conroy v. Schott*, 363 F.2d 90, 92 (6th Cir.1966); *In re Independent Clearing House Co.*, 77 B.R. 843, 860 (D.Utah 1987). Another court found that knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent. *In re American Properties, Inc.*, 14 B.R. 637, 643 (D.Kan. 1981).

■ The second theory, Haw.Rev.Stat. § 651C–4(a)(2), dispenses with the requirement of intent. Rather, any transfer whereby the transferee gives less than "reasonably equivalent value" in exchange for the transfer from the debtor corporation and has the effect of reducing the debtor corporation's assets by a certain sum may also be avoided. As adopted by Hawaii, a person gives "value" in exchange for a transfer or obligation if:

> property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Haw.Rev.Stat. § 651C–3(a).

However, Hawaii's adoption of the Uniform Act provides for an "out" to certain transferees who wish to recover the value of property they gave the debtor. Haw. Rev.Stat. § 651C–8(a) permits transferees who received the transfer in good faith and gave reasonably equivalent value to recover any value they exchanged in a transaction avoided under Haw.Rev.Stat. § 651C–4(a)(1). Haw.Rev.Stat. § 651C–8(d) permits transferees who received a transfer in good faith to recover any value they gave in a transaction avoided under Haw. Rev.Stat. § 651C–4(a)(2). *See also* 11 U.S.C. § 548(c).

### 2. Good Faith

■ Even if the transferee gave reasonably equivalent value in exchange for the transfer avoided on either of the alternate theories, the transferee may not recover such value if the exchange was not in good faith because good faith is "indispensable" for the transferee who would recover any value given pursuant to 11 U.S.C. § 548(c), the equivalent of Haw.Rev.Stat. § 651C–8. *See In re Candor Diamond Corp.*, 76 B.R. 342, 351 (Bankr.S.D.N.Y. 1987); *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917); *In re Roco Corp., supra*, 701 F.2d at 984 (1st Cir. 1983); *In re Health Gourmet, Inc.*, 29 B.R. 673, 677 (Bankr.D.Mass.1983). Palm Seedlings–A's reliance on cases which purportedly contravene this proposition is misplaced. In *In re Baker & Getty*, 88 B.R. 792 (Bankr.N.D.Ohio 1988), the trustee did not even contest the issue of good faith. *In re Independent Clearing House Co., supra*, is also distinguishable because the bankruptcy court erroneously failed to make a finding with respect to good faith.

■ The appellants bear the burden of proof in establishing that Palm Seedlings–A received the transfer in good faith. *In re Candor Diamond Corp.*, 76 B.R. at 351, *citing In re Health Gourmet*, 29 B.R. at 677; L. King, 4 *Collier on Bankruptcy*, § 548.10 at 548.108 (15th Ed.Supp.1982). No party in this matter, however, has fully briefed this court on what exactly constitutes "good faith." One court has remarked that a lack of good faith is demonstrated by a transferee who knows that a debtor is operating a Ponzi scheme. *In re Independent Clearing House*, 77 B.R. at 861.

■ An early case cited by the trustee in this case held that a transferee's

> knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors ... should be deemed to have notice ... as would invalidate the sale as to him.

*Shauer v. Alterton*, 151 U.S. 607, 621, 14 S.Ct. 442, 446, 38 L.Ed. 286 (1894). *See also Harrell v. Beall*, 84 U.S. (17 Wall.) 590, 21 L.Ed. 692 (1873). These pronouncements indicate that courts look to what the

transferee objectively "knew or should have known" in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint. Therefore, appellants' reference to the subjective assertions of good faith in the Grant affidavit are of no moment.

At least one court has held that if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent. *In re Polar Chips Int'l., Inc.*, 18 B.R. 480 (Bankr.S.D.Fla. 1982). Courts have been candid in acknowledging that good faith "is not susceptible of precise definition." *In re Roco Corp.*, 701 F.2d at 984. Notwithstanding the lack of a precise definition, the facts of this case reveal that Palm Seedlings–A has not met its burden of establishing good faith.

### B. *Alleged Fraudulent Transfers*

### 1. First Transfer

*Actual Intent*

■ As previously noted, the mere existence of a Ponzi scheme, which could be established by circumstantial evidence, has been found to fulfill the requirement of actual intent on the part of the debtor. Appellee convincingly argues that Agretech could not possibly have made the first payment from the sale of the seeds of the first shipment and that the money for this payment is traceable to $5,000,000.00 in new investments. Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes.

Moreover, Agretech should have known that transferring funds to earlier investors from later investors and not from the proceeds of the underlying business would ultimately operate to the detriment of its creditors. One court has found this fact sufficient to show actual intent. *See In re American Properties, Inc., supra.* In rebuttal, appellants refer to the purchase of $263,000.00 worth of seifrizzi seeds at Agretech's Waimanalo facility by a Mr. Liljedahl as evidence against the existence of a Ponzi scheme.

However, the chronology of the first payment and Mr. Liljedahl's alleged purchase undermines appellants' contentions in this regard. By affidavit, appellants can only show that Mr. Liljedahl made the last payment on his purchase on December 31, 1984. Appellants do not state when Mr. Liljedahl actually concluded the agreement embodying the purchase.

In contrast, appellee has demonstrated that the seeds at the Waimanole facility were not received by Agretech until December 18, 1984. Because Agretech made the first payment on December 17, 1984, Mr. Liljedahl's purchase of the Waimanole seeds which he "personally observed" could not have possibly contributed to the first payment because the Waimanole seeds arrived *after* the first payment. Mr. Liljedahl's affidavit clearly noted that he bought the Waimanole seeds "which were then in AGRETECH's possession" and not the Waiahole seeds, which were the only seeds planted *before* the first payment.

Appellants cannot successfully oppose a motion for summary judgment on the basis of the general allegation that Mr. Liljedahl purchased certain seeds when unrebutted specific facts refute that allegation. An examination of Mr. Liljedahl's affidavit does not reveal *any* indication that the "seeds/seedlings" which he purchased in December at Agretech's Waimanalo facility were the second shipment of seeds which originally belonged to Palm Seedlings–A. Indeed, appellee has brought forward evidence which indicated that at least two other partnerships invested in Agretech before this time for the cultivation of seifrizzi seeds.

The vagueness of Mr. Liljedahl's affidavit contravenes the *Celotex* requirement that the non-moving party adduce *specific facts* in order to establish a *genuine* issue of material fact. Mr. Liljedahl's use of the term "seeds/seedlings" highlights this vagueness and reinforces the implausibility of Mr. Liljedahl's purchase of seeds/seedlings which had been planted no more than two weeks before the purchase.

Mr. Liljedahl could not have purchased in December *seedlings* planted at the Waimanalo facility that same month by Palm Seedlings–A because such seeds require six to seven months in order to germinate.

Appellee also points to other facts which would circumstantially support the existence of a Ponzi scheme. First, Grant's demand for payment explicitly stated that the payment would induce other investors to transfer funds into new partnerships Grant was syndicating. Second, Grant exchanged seedlings of little value in return for over $100,000.00 under the first payment.

This evidence is very damaging to appellants' case. The gross disparity between the value exchanged and the accompanying explanation that the payment would induce investment is probably the most direct evidence of a Ponzi scheme obtainable absent an admission. Appellants have failed to directly rebut the significance of the explanation regarding new investment.

Instead, appellants challenge the notion that Grant did not give reasonably equivalent value in exchange for the transfer. While reasonably equivalent value more properly belongs to the analysis of the second theory of avoidance, evidence pertaining to reasonably equivalent value is germane to a finding of actual intent. A determination that Agretech did not receive reasonably equivalent value is probative, circumstantial evidence tending to prove that Agretech actually intended to defraud its creditors.

Appellants point to a shipping bond, an insurance policy and the seed broker's contractual guarantee of the first shipment as evidence of reasonably equivalent value. Due to Grant's assignment of the contractual guarantee and a $40,000.00 bond with respect to the first shipment, appellants argue that there exists a material issue of genuine fact as to whether reasonably equivalent value was given. Appellants further note that Grant purchased a property insurance policy, naming an Agretech subsidiary, "The Plant Jungle," as the insured.

With regard to the insurance policy, appellants have not explained the relation between that particular subsidiary of Agretech and the transfers at issue here. While it is not implausible that this policy was purchased in connection with the transfers in question, appellants have simply made the bald allegation that the insurance policy constituted value. In their pleadings, appellants did not mention that the subsidiary was in any way connected with Palm Seedlings–A's purchase of seeds on behalf of Agretech.

With regard to the bond and the seed broker's contractual guarantee of the first shipment, there is no indication in the record that this value was ever transferred to Agretech. The document to which appellants cite merely indicates that Grant assigned to Agretech the "partnership [Palm Seedlings–A] credit balance with Encinitas Foliage [the seed broker]," and makes no mention of the assignment of any bond or guarantee. Moreover, assurances for safe delivery of the seeds could hardly convert a transfer of approximately $5,000.00 worth of seeds into the *reasonably* equivalent value of the $229,000.00 purchase price for those seeds.

■ It is also appellants' position that Agretech was obligated by contract to make the transfers at issue. Furthermore, appellants cite *In re United Energy Corporation*, 102 B.R. 757 (9th Cir. BAP 1989) for the proposition that payments on antecedent debts constitute valid consideration. Apparently, appellants contend that the transfers were made for reasonably equivalent value because the transfers constituted payment on the antecedent debt which Agretech owed to Grant under the contract due to Grant's previous transfer of seeds and money to Agretech.

Appellant's argument fails in the first instance because it ignores the nature of the contract between the parties. Although appellants have attached the Grant affidavit in which Mr. Grant states in a conclusionary fashion that Agretech's obligation to transfer was "irrevocable," appellants ignore a plain reading of the contract language which provided that Palm Seed-

lings–A would guarantee a certain germination rate. Appellants interpret the contract to mean that Agretech was unconditionally obligated to pay the sums in questions regardless of whether it ever received anything of value.

Under Hawaii law, the legal effect to be given a contract is a question of law for the court. *Hanagami v. China Airlines, Ltd.,* 67 Haw. 357, 688 P.2d 1139 (1984). Hawaii law also provides that courts may consider evidence outside of the contract if there is "any doubt or controversy as to the meaning of the language embodying their [the parties'] bargain." *Hokama v. Relinc Corp.,* 57 Haw. 470, 559 P.2d 279 (1977). It is unclear from the record below whether this issue was raised before the district court.

▮▮▮▮▮▮ Even assuming appellants raised this particular issue below, however, we reject appellants' interpretation of the contract. We review a district court's interpretation of a contract *de novo* if the district court did not go beyond the four corners of the document. *L.K. Comstock & Co. v. United Eng. & Constructors,* 880 F.2d 219, 221 (9th Cir.1989). If the court drew upon extrinsic evidence in interpreting a contract, we will not reverse a court's factual findings as to the extrinsic evidence unless clearly erroneous. *Culinary and Serv. Employees Union, AFL–CIO Local 555 v. Hawaii Employee Benefit Admin., Inc.,* 688 F.2d 1228 (9th Cir.1982).

Because there is no indication that the district court made factual findings as to any extrinsic evidence, we will interpret the contract *de novo.* Paragraph four of the Addendum to the Agency and Purchase Agreement simply provided that "[t]he purchase price of the Plants as per paragraph 5 of the Agency and Purchase Agreement, shall be increased from $225,000 to $229,000." In paragraph five of the Addendum, Palm Seedlings–A agreed that "[i]n the event the germination test result is not 65 percent, such deficiency shall be filled by Partnership purchasing additional seeds."

Making all reasonable inferences in favor of appellants, we will assume that there is some ambiguity on the face of the contract

language and we will consider the extrinsic evidence of the Grant affidavit. The Grant affidavit simply states without more that Agretech's obligation to make the payments was "irrevocable." This general conclusion is of no help in interpreting any conceivable ambiguity in the contract language because it does not set forth any specific facts as to why Agretech would agree to pay over large sums of money even if it received in exchange absolutely nothing of value.

Indeed, there is every indication that Agretech's payment was conditioned on Palm Seedlings–A's fulfillment of its obligation to ensure a certain germination rate. Paragraph four makes no mention of an unconditional obligation on the part of Agretech, whereas paragraph five immediately follows the provision pertaining to the purchase price and unequivocally states that any germination deficiency "shall be filled" by Palm Seedlings–A. Thus, we conclude that the Addendum conditioned Agretech's payment on Palm Seedlings–A's performance under paragraph five and did not unconditionally require Agretech to make the payments, as appellants contend.

We also find that *In re United Energy Corporation,* 102 B.R. 757 (Bankr. 9th Cir. 1989) does not aid appellants' assertions that the transfers were for reasonably equivalent value. *United Energy* is distinguishable because the issue before that court concerned payment of an antecedent debt under 11 U.S.C. § 548(a)(2), the equivalent of Haw.Rev.Stat. § 651C–4(a)(2). The present issue, in contrast, concerns the avoidance of fraudulent transfers under Haw.Rev.Stat. § 651C–4(a)(1), the equivalent of 11 U.S.C. § 548(a)(1), where the entire transfer may be avoided, even if reasonably equivalent value was given, so long as the transferor actually intended to hinder, delay or defraud its creditors and the transferee accepted the transfer without good faith. *See In re Independent Clearing House,* 77 B.R. at 859.

*Reasonably Equivalent Value*

Because we conclude that the district court was correct in finding that appellants failed to establish a genuine issue of material fact with respect to Agretech's actual

intent to defraud its creditors by transferring the sums in question, we need not reach the alternative basis for avoidance under Haw.Rev.Stat. § 651C–4(a)(2) and its common-law equivalent. Thus, the next issue to be decided is whether or not the district court erred in alternatively ruling that appellants must return all sums transferred to them because they were transferees in bad faith. For the following reasons, we find that appellants were not transferees in good faith.

*Good Faith*

■ As previously discussed, Haw.Rev. Stat. §§ 651C–4(a)(1) and its common-law counterpart permit the trustee to recover the full amount transferred. However, if the transferee received the transfer in good faith, it may recover any value given in exchange for the transfer under Haw.Rev. Stat. § 651C–8(a) and the common law. Although questions of good faith may generally be difficult to establish on summary judgment, it is important to bear in mind that appellants carry the burden of demonstrating their *objective* good faith at trial.

■ The trustee asserts that Grant received the transfers in bad faith on two grounds: 1) the value received by Grant was grossly in excess of the value Grant exchanged for the transfer; and 2) in its demand for these transfers, Grant affirmatively stated the transfers would induce new investment. The first fact is highly probative of bad faith because Agretech's willingness to accept virtually no value in exchange for its transfer of significant sums of money should have put Grant on notice of a fraudulent scheme. A diligent inquiry, as required by such notice, certainly would have led one to conclude that a business venture cannot long remain solvent where the enterprise certainly could not sell ungerminated (worthless) seeds in order to finance the transfer payments.

Indeed, Grant's statement regarding new investment, coupled with the disproportionate exchange of value, is a strong indication that Grant not only knew of the fraud, but was an active participant in it as well. It is significant that Grant did not phrase its demand for payment in terms of contractual obligations, but rather in terms of new investment opportunities which would accrue to Grant should the transfer be made. One wonders why possible benefits to Grant would provide any incentive to Agretech to effect the transfers unless Agretech also had an interest in inducing new investments as part of the overall Ponzi scheme.

Appellants' failure to account for Grant's damaging statements reinforces the implausibility of Grant's good faith under the circumstances. Nevertheless, appellants maintain that a genuine issue of fact exists with respect to Grant's good faith. To support this contention, appellants note that Grant had sought guarantees of delivery and germination of the first shipment.

The shipment guarantees secured by Grant are probative of Grant's concern that the seeds germinate and do not bear on Grant's good faith after the seeds failed to germinate. The record does not indicate that Grant made use of these guarantees after both shipments of seed failed to germinate as expected. Rather, it is clear that Grant did not hesitate to seek the payment transfers from Agretech in spite of the germination failure.

Second, appellants aver that Grant was obligated as general partner by fiduciary duties to enforce Grant's rights under the contract and seek the payment. We previously rejected this reasoning because appellants failed to establish that the contract unconditionally obligated Agretech to effect the transfers. Finally, appellants would find evidence of good faith in Grant's inspection of Agretech facilities, financial records and the absence of law suits against Agretech.

The absence of law suits against a company and indications of business growth do not vitiate the existence of a successful Ponzi scheme, but rather support the existence. Although appellants aver that Grant inspected Agretech's financial records, appellants do not explain what basis in those records Grant found for the solvency of Agretech. In fact, the appellee has brought forward specific evidence which indicates that although Agretech received

only $1.7 million in commercial plant sales, it paid out approximately $11.5 million to investors and accumulated investments of approximately $38 million during the course of the enterprise.

A view of appellants' evidence through the "prism of the substantive evidentiary burden" appellants bear at trial, as required by the Court in *Anderson v. Liberty Lobby,* reveals that the appellants cannot establish a genuine issue of material fact as to Grant's good-faith receipt of the transfers in question. *See Anderson v. Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513. The evidence which Grant presented did not rise to the level of facts specific enough to contradict the evidence set forth by appellee. Therefore, the district court properly held that Grant acted in bad faith as the transferee of the funds.

### 2. Second Transfer

The analysis of the second transfer is virtually identical to the analysis of the first transfer. The only difference between the two is Grant's candid admission with respect to the second transfer that "funds expected by them [Agretech] to be available for purchase of the Seifrizzi seedlings owned by Palms–A have not come in as rapidly as they projected ..." Apparently, Mr. Liljedahl's alleged purchase of seed/seedlings the previous December did not aid Agretech in meeting the second payment.

Despite Grant's acknowledgement that Agretech could not make the payments, Grant demanded timely payment of the second transfer. Grant's insistence on this second payment in view of Agretech's imminent insolvency is further support of Grant's bad faith. Likewise, Agretech's willingness to make this payment buttresses appellee's contentions that Agretech actually intended to defraud, delay or hinder its creditors by transferring the monies.

### III. PARTIAL SUMMARY JUDGMENT WITH RESPECT TO LIMITED PARTNERS

The monies which Palm Seedlings–A allegedly received as a fraudulent convey-ance was transferred to its limited partners in respect to their capital contributions. The district court awarded judgment against the limited partners of Palm Seedlings–A to the extent of the distributions they received. The appellee does not contend that the limited partners received those distributions in bad faith.

Rather, the appellee asserts that 11 U.S.C. § 550(a)(1) and (2) of the Bankruptcy Code and Haw.Rev.Stat. § 651C–8 permit the trustee to recover the fraudulently conveyed funds from the initial transferee and any subsequent trustee. In rebuttal, the appellants first contend that the distributions were for "value." This argument rests on the exception contained in 11 U.S.C. § 550(b) and Haw.Rev.Stat. § 651C–8(b)(2) where good-faith transfers for value are not voidable.

■ Under Haw.Rev.Stat. § 651C–3, value is property or the securing or satisfaction of debt. Under the Bankruptcy Code, limited partnership interests are classified as "equity security." 11 U.S.C. § 101(15). The partnership distributions here were not for value because Palms Seedlings–A made the distributions on account of the partnership interests and not on account of debt or property transferred to the partnership in exchange for the distribution.

■ Furthermore, comment 2 to the Uniform Fraudulent Transfer Act states that value is to be determined in light of the act's purpose, in order to protect the creditors. Any consideration not involving utility for the creditors does not comport with the statutory definition. Unif. Fraudulent Transfer Act § 3, comment 2, 7A U.L.A. 639, 651 (1985). Thus, distributions to limited partners is not value because any other definition would not further protection of creditors.

■ Second, the limited partners argue that requiring the limited partners to return their distribution is not permitted by Hawaii's limited partnership law. However, Haw.Rev.Stat. § 425–37 provides that:

[w]hen a contributor has rightfully received the return in whole or in part of the capital of the contributor's contribution, the contributor is nevertheless liable to the partnership for any sum, not in excess of the return with interest, necessary to discharge its liability to all creditors who extended credit or whose claims arose before the return.

On the basis of this section, appellee argues that the limited partners are liable for any distribution they received because the return of the distribution is necessary to protect creditors such as the bankruptcy trustee. The premise of appellee's contention is that the distributions at issue here constituted "the return ... of the contributor's contribution ..."

One could argue that because the distribution to the limited partners was entirely traceable to partnership profits and not to the limited partners' capital, the distribution to the limited partners on the basis of this statute is not subject to the claims of partnership creditors. Appellee has not cited any persuasive authority to support its blanket proposition that all distributions to limited partners amount to the return of contributed capital. Because appellants failed to present this argument, however, they are therefore deemed to have waived the issue.

The limited partners instead maintain that the language of Haw.Rev.Stat. § 425–37 does not require that they return the distribution because the trustee is not a creditor within the meaning of the statute and because the trustee's claim in the form of a judgment did not arise until *after* the distribution. Appellants have failed to cite any authority which would exclude the trustee from the definition of a creditor. Because the trustee stands in the overshoes of the debtor's creditors, his claim does involve ordinary business creditors whose claims arose *before* the distribution.

## III. PREJUDGMENT INTEREST

### A. *Palm Seedlings–A*

██ Hawaii law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b). The district court awarded prejudgment in-

terest on funds transferred to Palm Seedlings–A from the date of the transfer rather than from the date the complaint was filed. Although there is no Hawaii law directly on point, Hawaii law pertaining to conversion, for example, permits prejudgment interest to be awarded from the date of the conversion. *Lucas v. Liggett & Myers Tobacco Co.*, 51 Haw. 346, 348, 461 P.2d 140 (1969).

██ Citing *In re Independent Clearing House Co.*, 77 B.R. 843, 875–76 (D.Utah 1987), *In re Express Liquors, Inc.*, 65 B.R. 952, 962 (D.Md.1986) and *In re Republic Financial Corp.*, 75 B.R. 840 (D.Okla. 1987), appellants maintain that prejudgment interest may only be awarded from the date the adversarial proceeding for recovery of monies was initiated. None of the cited authorities are persuasive. For example, the court in *In re Independent Clearing House* merely confirmed that interest could be awarded from the date the complaint was filed and did not hold that prejudgment interest must be awarded no earlier than that date.

*In re Express Liquors* is distinguishable because it addressed the issue of post-judgment interest. *In re Republic Financial* involved a proceeding under 11 U.S.C. § 547, whereas the trustee below and on this appeal premised its recovery under 11 U.S.C. §§ 544, 548 and 550. Analogous fraudulent conveyance actions under the Bankruptcy Code have upheld prejudgment interest from the time of transfer where fraud was involved. *In re Independent Clearing House Co.*, 41 B.R. 985, 1015–16 (Bankr.1984), *aff'd in part and rev'd in part*, 77 B.R. 843 (D.Utah 1987), *citing Jackson v. Star Sprinkler Corp.*, 575 F.2d 1223 (8th Cir.1978).

Because the district court found that fraud was involved in the partnership's receipt of the transfer, the district court did not abuse its discretion in awarding prejudgment interest from the date of transfer. Appellants' contentions that this was an abuse of discretion because the case was dismissed on summary judgment and not at trial and that the trustee did not ask

for interest in the complaint are not well taken. The trustee did ask for interest, and appellants cited no authorities which distinguish between summary judgment and trial for purposes of awarding interest.

### B. Limited Partners of Palm Seedlings–A

 Appellants also dispute the award of any prejudgment interest on distributions made to the limited partners. Because the limited partners received the monies in good faith, appellants argue that they should not be required to return the funds with interest. This argument fails because Haw.Rev.Stat. § 425–37 specifically provides that limited partners required to return sums under that section are liable for the interest thereon. This is a sensible result because the limited partners enjoyed the benefit of the transferred funds, even though they must later return the distributions in order to protect the creditors of the partnership. *See Kittredge v. Langley,* 252 N.Y. 405, 169 N.E. 626, 631 (1930).

### IV. MOTION FOR RECONSIDERATION

 Motions for reconsideration may properly be denied where the motion fails to state new law or facts. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 505 (9th Cir.1986). In arguing that the district court abused its discretion in denying its motion for reconsideration, appellants contend that the district court failed to consider the newly discovered Memorandum of Plea Agreement of Richard Garcia, who was the former president of Agretech, and the recently issued opinion in *In re Baker & Getty Financial Services, Inc.,* 88 B.R. 792 (Bankr.N.D.Ohio 1988). Neither of these grounds would have warranted granting the motion for reconsideration.

According to appellants, the Plea Agreement established that no Ponzi scheme existed until 1985, because Mr. Garcia plead guilty to participation in a Ponzi scheme only for 1985 and 1986. However, upon closer examination, the Plea Agreement demonstrates, if anything, the existence of a Ponzi scheme at least as early as 1982. Mr. Garcia admitted to repaying earlier investors with the proceeds of new investors' funds, and attached a schedule indicating the fraudulent receipts and disbursements began in 1982.

*In re Baker & Getty* added nothing to appellants' contentions before the district court. Although the *In re Baker & Getty* court only allowed the trustee to recover funds transferred in excess of the value received by the debtor corporation pursuant to 11 U.S.C. § 548(a)(2), that case did not involve intent to defraud under 11 U.S.C. § 548(a)(1) or bad faith, as was the case in this matter before the district judge. For the above reasons, the final partial judgment and supplemental final partial judgment of the district court is AFFIRMED.

AFFIRMED.