## In re EVERGREEN SÉCURITY, LTD., Debtor.

R.W. Cuthill, Jr., Trustee, Plaintiff,

v.

Harold James Kime, an individual, and First American Life and Health Insurance Corporation, a Florida corporation, Defendants.

Bankruptcy No. 01–00533–6B1.
Adversary No. 02–110.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

June 6, 2003.

R. Scott Shuker, Orlando, FL, Attorney for Plaintiff.

Wallace F. Stalnaker, Jr., Longwood, FL, Attorney for Defendant.

## MEMORANDUM OPINION

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This Adversary proceeding came for hearing December 23, 2002 ("Hearing"), on Plaintiff, R.W. Cuthill, Jr.'s ("Plaintiff", "Trustee" & "Cuthill"), Complaint for avoidance and recovery of transfers pursuant to 11 U.S.C. §§ 544, 548 and 550 of the Bankruptcy Code by Evergreen Security, Ltd. ("Evergreen"), for the benefit of the Defendants, Harold James Kime ("Kime") and First American Life and Health Insurance Corporation ("First American") (collectively, the "Defendants"), who along with other lawyers, brokers, investment advisors and insurance agents (collectively, "Financial Professionals") sold certificates in Evergreen to investors, including James R. Aspinwall ("Aspinwall"), a former client of Kime. The Complaint was filed May 10, 2002 ("Complaint").

Evergreen, formerly owned by Greg White ("White") was sold to a Bahamian corporation, owned by William J. Zylka ("Zylka") in 1998. Thomas Spencer ("Spencer"), Robert Boyd ("Boyd") and Thomas Coyle ("Coyle") managed Evergreen, after its sale to Zylka. The primary management company was American Bond Partners ("ABP") and then later BJM International Services, Inc. took control ("BJM"). Funds invested in Evergreen were held by various trusts including Intrados, S.A. ("Intrados") and Surety Bank & Trust Company Limited ("Surety Bank"). The following findings of fact and conclusions of law are made.

## FINDINGS OF FACT

1. Evergreen is an international business corporation formed in 1994 pursuant to the laws of the British Virgin Islands. From its inception, Evergreen has been externally managed. Evergreen has no employees and its operations are directed by outside managers.

2. Evergreen is owned by Evergreen Holding Investment Corporation, a Bahamian Holding Company ("Holding"). White, a citizen of the Bahamas, owned Evergreen until 1998. White transferred his shares of Evergreen to Holding in 1998. Holding's shares of Evergreen were purchased by True Investments, Inc., a Bahamian corporation, owned or controlled by Zylka, in 1998.

3. Evergreen was managed by Spencer, Boyd, and Coyle prior to April 1998. The primary management company was ABP, a Bahamian partnership. BJM became the outside manager of Evergreen in April 1998.

4. Evergreen created Evergreen Trust, a wholly owned trust, to pool investor funds and purchase investments. Funds invested in Evergreen were held by various trusts including Intrados, and Surety Bank.

5. Evergreen began selling certificates in 1994 through Financial Professionals. The Financial Professionals received remuneration for the sale of certificates. Commissions ranged from one percent (1%) to nine percent (9%) of the face amount of each certificate ("Commission").

6. Investors purchased five (5) year certificates or bonds, which paid periodic, fixed interest rates ranging from ten percent (10%) to twelve percent (12%). Investors did not own the certificates, but were issued a certificate in the name of a trust or numbered account.

7. The investments were supposed to be fully secured by U.S. Mortgage backed securities, but instead were supported by mortgage backed security derivatives ("MBS Derivatives"). MBS Derivatives are volatile and consequently Evergreen did not achieve sufficient profits to pay interest on the certificates.

8. Evergreen's investment scheme collapsed and it filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on January 23, 2001 ("Petition Date"). Approximately $214 million of the certificates remained unpaid on the petition date.

9. R.W. Cuthill, Jr., was appointed as Chapter 11 Trustee March 14, 2001. Cuthill is a certified fraud examiner and public accountant specializing in forensic accounting and fraud. Following the appointment, he assumed control of Evergreen's books and records, as well as ABP's and BJM's books and records. (collectively, "Books and Records"). Cuthill also obtained documents from the New York District Attorney's office, which had subpoenaed documents from BJM prior to the his appointment.

10. Evergreen was a Ponzi scheme. Evergreen used most funds received from new investors to pay prior investor claims. The remaining funds were used to pay the excessive costs of the investment program, including the Commissions, management fees, administrative fees, and fees paid to the offshore trusts. Officers and directors of ABP, BJM and Zylka withdrew large sums of investor funds.

11. Evergreen's Ponzi scheme slowly collapsed as evidenced by its financial deterioration. In December of 2000, Evergreen had liabilities of $45 million and assets of $26 million. By December of 2002, Evergreen's liabilities had increased to $214 million and its assets had decreased to $3 million.

12. Kime sold life and health insurance and annuities. First American, f/k/a Harold H. Kime and Associates, Inc. was incorporated under the laws of Florida in 1977. (Plaintiff's Ex. No. 80). First American operated as a small family owned insurance company from 1977 through 2001. Kime became president of First American in 1991, succeeding his father as president, and continued in that role until the dissolution of First American in 2001. Kime promoted his services of asset protection, even though he had no special training or education in the field.

13. Kime was introduced to Evergreen's investment program by Spencer in 1996. Kime had a prior relationship with Spencer, from Spencer's involvement with insurance products. Spencer introduced Kime to Hernan Castro–Gehrels ("Castro") and Intrados, and solicited Kime to sell certificates or introduce his clients to Intrados.

14. Kime instructed his clients to create a trust with an offshore trust company, such as Intrados, which in turn would invest in an international offshore mutual fund, such as Honor, F.A. ("Honor").

15. Nearly all funds invested in Honor were invested in Evergreen. Kime aided in the creation of the trust, forwarded documents and funds to Intrados and drafted letters of wishes for the purchase of Evergreen certificates (Plaintiff's Ex. No. 97). Evergreen paid Commissions on Honor certificates to the extent it received transferred funds.

16. Kime received remuneration for his clients' investment in the certificates, even though he insisted he only received a "referral fee" for introducing his clients to Intrados. (Plaintiff's Ex. Nos. 2–47). He received $46,103.85 and First American received $146,389.16. These payments represent a one percent (1%) to nine percent (9%) commission.

17. All of the Payments were drawn on checks from either Intrados' (Plaintiff's Ex. Nos. 2–28), Caribbean Administrative Services Ltd.'s ("CAS") (Plaintiff's Ex. Nos. 29–39), or Investment Services International Ltd.'s ("ISIL") (Plaintiff's Ex. Nos. 40–47) bank account. These Payments originated from Evergreen Trust's Colonial Bank account.

18. Evergreen wire transferred funds to either Intrados, CAS, or ISIL in conjunction with a Management Report and Commission and Compensation Report (Plaintiff's Ex. Nos. 2–47). Intrados, CAS, or ISIL then distributed the transferred funds to the brokers identified on the Commission and Compensation Reports.

19. Intrados, CAS, and ISIL were pay agents and had no authority to deviate from the Commission and Compensation Reports.

20. Kime relied solely on the representations of Spencer and Castro regarding the legitimacy of Evergreen, Intrados, and Honor. Kime visited the offices of ABP, BJM, and Intrados, and attended seminars in the Bahamas regarding the investment strategy of Atlantic Portfolio Analytics & Management, Inc., a/k/a APAM, Inc. ("APAM").

21. Kime insisted he had no knowledge of the relationship of these entities to Evergreen and did not need to investigate Evergreen because he was unaware his clients were investing in or that he was receiving compensation from Evergreen. Kime was aware of Evergreen as demonstrated by a diagram he drew for his client, Aspinwall, detailing the investment structure of Evergreen.(Plaintiff's Ex. No. 83).

22. The diagram drawn by Kime demonstrates his specific knowledge of Evergreen. Despite knowing of Evergreen,

Kime took no action to determine if Evergreen was a legitimate business. He did not review financial statements, perform any independent research or due diligence on Evergreen.

23. John R. Smith, ("Smith") is an expert in securities, investment products, due diligence and the industry standards of the sale or referral of securities and investment products. Smith's testimony was credible and is accepted.

24. Prior to the sale or referral of an investment product, a financial professional owes certain duties and obligations to his client to "know your client" and have a reasonable knowledge about the product or investment strategy which is being recommended.

25. A financial advisor needs to investigate the financial, performance, and personnel background of the investment manager or the offering company. The associated risk factors and costs surrounding the investment strategy or product also need to be disclosed and evaluated. A financial professional should never rely solely on a sponsor or issuer's evaluation about an investment product.

26. Kime did not perform any due diligence or investigation which would have justified: (i) referring a client to Intrados or (ii) selling the Evergreen certificates. He did no investigation of the historical performance of either Intrados or Evergreen, the principals of either company or had any knowledge or understanding of the associated risks and costs of the investment program.

27. Kime did not request or review marketing materials or promotional literature related to Evergreen or Intrados. He did nothing to authenticate the information provided by Spencer or Castro. He testified the aforementioned information was unavailable due to Costa Rican law governing trusts, so he relied upon the representations of Spencer and Castro.

28. The lack of information should have signaled the unsound nature of the financial product. Kime should not have referred a client to Intrados or sold Evergreen certificate if he could not obtain independent and reliable information on the investment manager or the investment product.

29. Kime solicited investors to create offshore trusts and invest hundreds of thousands of dollars in a company he knew nothing about, without performing any due diligence or investigation.

30. Aspinwall, Kime's client, invested approximately $670,000.00 in Evergreen. Kime assured him the investments were safe and an effective asset protection tool. Kime had previously solicited Aspinwall to invest in two nine-month promissory note programs, ETS Payphones ("ETS") and First American Capital Trust ("FACT"). Although Kime assured him these investments were safe, Aspinwall lost money in both ETS and FACT. ETS and FACT were also fraudulent investment schemes.

31. Approximately seventy-five percent (75%) of Kime and First American's annual income was comprised of Commissions earned from the sale of Evergreen certificates from 1997 through August of 2000. Additional income earned by Kime and First American consisted of commissions earned from the sale of the ETS and FACT nine-month promissory notes. First American had no other substantive source of revenue other than the Commissions generated from the sale of Evergreen certificates and the ETS and FACT nine-month promissory notes.

32. First American executed articles of dissolution four and a half months after Evergreen ceased doing business. Kime was the primary decision-maker of First

American. The other employees of First American were immediate family members. First American held few board meetings, but did keep minutes at the meetings.

33. First American occasionally ignored corporate distinctions in its financial transactions. Some of the checks received from the sale of the Evergreen certificates were made payable to First American, while other checks were made payable to Kime. Most checks were deposited into First American's bank account, while some checks were cashed by Kime. Kime testified that there was no particular reason why some checks were made payable to him and others made payable to First American, and he offered no explanation why he chose to cash some checks and deposit others.

34. Kime's testimony that he was unaware of the existence of Evergreen, uninformed that he and First American received a commission from Evergreen, and unfamiliar with the flow of investment funds from the investor to Evergreen is not credible. Kime and First American understood where investor funds were going and how Commissions were calculated.

## CONCLUSIONS OF LAW

1. The Trustee alleges payments by Evergreen to Defendants totaling $192,493.01 are avoidable as actually or constructively fraudulent pursuant to 11 U.S.C. §§ 544, 548, and 550, and Florida Statutes §§ 726.105(a) and (b), 726106(1), and 726.108. Defendants deny the allegations and assert the Payments are not property of Evergreen's bankruptcy estate. The required elements for establishing a transfer was actually and/or constructively fraudulent are pursuant to 11 U.S.C. § 548 and in Fla. Stat. § 726.101 et. seq.

2. A trustee seeking to avoid transfers of a debtor must establish by a preponderance of the evidence that the 1) Debtor transferred an interest in property and 2) the transfer was made with the actual intent to hinder, delay or defraud creditors. The defenses of 548(c) become available to the Defendant if those elements are established. 548(c) does not permit a transferred interest to be avoided if the transferee gave value in return and did so in good faith.

3. The avoidance period, available to the Trustee, is within one year prior to the bankruptcy filing. *In re Model Imperial, Inc.*, 250 B.R. 776, 789 (Bankr.S.D.Fla. 2000). The reach back period is extended to four years pursuant to Florida law. *See* Fla. Stat. §§ 726.105 and 726.106.

4. To qualify as the initial transferee the recipient must exercise dominion and control over the funds. *See In re Chase & Sanborn Corporation*, 848 F.2d 1196 (11th Cir.1988); *see also Bonded Financial Services Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988). A party that receives a transfer directly from the debtor will not be considered the initial transferee unless that party gains actual dominion or control over the funds.

5. The Defendants were initial transferees. The Payments were transferred from Evergreen Trust's bank account to either Intrados, CAS, or ISIL. All funds transferred by Evergreen to the Pay Agents and the Defendants were property of the Debtor's estate. Intrados, CAS, and ISIL were conduits and had no discretion with regards to the disposition of the funds. The Pay Agents dispersed all of the funds transferred to the brokers in accordance with the Commission and Compensation Reports.

6. Debtor paid Kime $46,103.85 and First American $146,389.16 between Janu-

ary 15, 1997 and August 8, 2000. The payments constitute transfers of the Debtor's property within four years of the Petition Date.

■ 7. A conveyance may be fraudulent within the meaning of section 548, if either: (1) it was made with the actual intent to hinder, delay, or defraud creditors-regardless of whether the transferor was insolvent at the time; or (2) the transferor was insolvent (or likely to become insolvent) and received less than a reasonably equivalent value in exchange for the transfer-regardless of the transferor's intent. *See In re Independent Clearing House Co.,* 77 B.R. 843 (D.Utah 1987).

### Actual Fraud

■ 8. When the existence of a Ponzi scheme is proven by the evidence a presumption of actual fraudulent intent is applied. *See In re World Vision Entertainment, Inc.,* 275 B.R. 641, 656 (Bankr. M.D.Fla.2002); *Hayes v. Palm Seedlings Partners–A (In re Agricultural Research & Technology Group, Inc.),* 916 F.2d 528, 535–36 (9th Cir.1990)(citing *Conroy v. Shott,* 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir.1966)).

9. Debtors are inferred to know from the very nature of Ponzi scheme activities, that investors will lose their money. *See In re Independent Clearing House Co.,* 77 B.R. at 860.

■ 10. A debtor's knowledge that future investors will not be paid is sufficient to establish actual intent to defraud. *Id.* Debtor's intent to hinder, delay, or defraud creditors is present when a transfer is made in furtherance of a Ponzi scheme. Evergreen's investment program was a Ponzi scheme.

■ 11. Insolvency of the debtor as required by § 548(a)(1)(B) is established, when the Debtor is operating a Ponzi

scheme. *See In re Rodriguez,* 209 B.R. 424, 432 (Bankr.S.D.Tex.1997); *Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425 (Bankr.N.D.Ill.1995).

■ 12. The Debtor paid Commissions to the Defendants with the actual intent to defraud both current and future investors. The transfers were made with actual fraud intent and are avoidable pursuant to Section 548 of the Bankruptcy Code and Florida Statutes Section 726.105.

### Constructive Fraud

13. To demonstrate constructive fraud, the Trustee must prove the Debtor was insolvent at the time the transfer was made and received less than reasonably equivalent value in exchange for the transfer. *See In re XYZ Options, Inc.,* 154 F.3d 1262, 1275 (11th Cir.1998).

■ 14. There is a two part inquiry to determine whether reasonably equivalent value was provided. *In re Tower Environmental, Inc.,* 260 B.R. 213, 225 (Bankr.M.D.Fla.1998)(citing *In re R.M.L, Inc.,* 92 F.3d 139 (3d Cir.1996)). First, was any value received by the debtor in exchange for the transfer. *Id.* Second, if value was given was the value given reasonably equivalent of the funds transferred. *Id.*

15. In *World Vision Entertainment, Inc.,* the court held that value must be assessed on a "case by case basis" by looking at the surrounding circumstances and by focusing on the precise nature of the transfer. *See id.* at 657; *see also In re Financial Federated Title and Trust, Inc.,* 309 F.3d 1325, 1332 (11th Cir.2002). Similarly, the Eleventh Circuit Court of Appeals in *In re Financial Federated Title & Trust, Inc.,* 309 F.3d 1325, 1332 (11th Cir. 2002) stated, "a determination of whether value was given under Section 548 should focus on the value of the goods and ser-

vices provided rather than on the impact the goods and services had on the bankrupt enterprise." *Id.*

■ 16. The Eleventh Circuit examined "reasonably equivalent value" in the context of fraudulent transfers in *General Electric Credit Corporation of Tennessee v. Murphy (In re Rodriguez)*, 895 F.2d 725 (11th Cir.1990). The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's estate. 11 U.S.C. § 548(a)(2); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir.1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960).

■ 17. This provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981). In such a situation, "the debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer. *Id.*

■ 18. "Value" must be determined by an objective standard. *See In re Independent Clearing House Co.*, 77 B.R. at 859 (citing *Pereira v. Checkmate Communications Co. (In re Checkmate Stereo & Elecs., Ltd.)*, 9 B.R. 585, 591 (Bankr. E.D.N.Y.1981)). Evergreen received funds from the investors Kime solicited. The funds equate to an objective tangible value. Constructive fraud has not been established since Kime provided value to Evergreen.

### 11 U.S.C. § 548(c) Defenses to Actual Fraud

19. While Kime and First American did not assert the 11 U.S.C. § 548(c) and Florida Statutes Section 726.109(1) defenses they are still reviewed. Both statutes provide an affirmative defense to actual fraud for individuals to whom the debtor's property is transferred, to the extent the individuals provided the debtor value in exchange for the transfers, and if they took the property in good faith.

■ 20. Defendant bears the burden of proving by a preponderance of the evidence that it gave value to the debtor and received the property in good faith. *See In re M & L Business Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir.1996). The transferee must also establish the funds were received in good faith. *11 U.S.C. § 548(c)*. Good faith is an objective standard. *See In re World Vision Entertainment, Inc.*, 275 B.R. at 659. Since Kime gave value to Evergreen the remaining issue is good faith.

■ 21. To determine whether a transferee acted in good faith for purposes of section 548(c), the court must look at what the transferee objectively "knew or should have known," and conclude that the transferee did not act in good faith because it had sufficient knowledge to place it on inquiry notice of the voidability of the transfer or the debtor's insolvency. *See id; see also Hays v. Jimmy Swaggart Ministries*, 263 B.R. at 211; *see also In re Model Imperial, Inc.*, 250 B.R. at 797–98.

■ 22. A transferee may not remain willfully ignorant of facts which would cause notice of a debtor's fraudulent purpose. Good faith is to be measured objectively, rather than subjectively. Consequently, a transferee may not put on "blinders" prior to entering into transactions with the debtor and claim the benefit of section 548(c), where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency. *In re Cannon*, 230 B.R. at 592.

23. Circumstances putting the transferee on inquiry notice as to a debtor's insolvency, an underlying fraud, or the improper nature of a transaction, will preclude a transferee from asserting a good faith defense. *See In re World Vision Entertainment, Inc.,* 275 B.R. at 659; *see also Hays v. Jimmy Swaggart Ministries,* 263 B.R. at 212; *In re Model Imperial, Inc.,* 250 B.R. at 797–98.

24. In evaluating good faith, a determination is made of the steps a prudent Financial Professional would take before recommending or selling Certificates. A Financial Professional, when receiving financial remuneration for the sale of an investment product or referral to an investment manager, needs to investigate: (i) the financial, performance, and personnel background of the investment manager or the offering company; (ii) the associated risk factors and costs surrounding the investment strategy or product need to be disclosed and evaluated; and (iii) should not rely solely on a sponsor's or issuer's word about an investment product.

25. The Financial Professional must review available investment ratings from qualified financial rating services, before selling or recommending. The Financial Professional must request and investigate audited financial statements from the sponsor or issuer, as well as other literature provided by the company discussion its sales history and the background of key employees.

26. Defendant did not take these steps and did not perform the minimal due diligence required to demonstrate good faith. The defenses available to actual fraud pursuant to 11 U.S.C. § 548(c) and Florida Statutes Section 726.109(1) are unavailable here due to lack of good faith.

### Piercing the Corporate Veil

27. The remaining issue is whether Kime should be personally liable for the avoidable transfers received by First American in the amount of $146,389.16.

28. First American was incorporated in Florida, the standard for piercing the corporate veil is controlled by applicable state law. *See In re B & L Laboratories, Inc.,* 62 B.R. 494, 502 (Bankr. M.D.Tenn.1986).

29. The Supreme Court of Florida has held a corporation is a well recognized legal entity which may conduct business in its own right as distinguished from the credit and assets of its stockholders. *See Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1120 (Fla.1984). Individuals who employ corporate laws of the state of Florida have the right to rely on the rules of law, which protect against personal liability. *See id.* at 1120–21.

30. A plaintiff must demonstrate by a preponderance of evidence, to find justification for piercing the corporate veil, that: (i) the shareholder dominated and controlled the corporation to such an extent that the corporation independent existence, was in fact nonexistent and the shareholder was in fact the alter ego of the corporation; (ii) the corporate form must have been used fraudulently or for an improper purpose; and (iii) the fraudulent or improper use of the corporate form caused injury to the claimant. *See id.; see also Orlando Regional Healthcare System, Inc. v. Columbia/HCA Healthcare Corp.,* 923 F.Supp. 1534, 1541 (M.D.Fla.1996).

31. First American was incorporated under Florida law in 1977 and was operated as a small family owned and operated life and health insurance company distinct from any one member of the Kime family.

32. Kime became president of First American in 1991 and continued in that role until First American was dissolved on June 1, 2001. First American did have other employees during Kimes' tenancy as president of First American, albeit they were Kime family members. This long running family business was eventually destroyed by the poor business choice of selling interests in fraudulent enterprises. Kimes' decisions dramatically impaired the financial futures of his clients and ruined his family business. First American was not set up to perpetrate fraud and was not operated or used as Kime's alter ego. First American was a legitimate, long term family business, eventually destroyed by the conduct its founder's son.

33. Despite Kime's conduct the high standard for piercing the corporate veil in Florida is not met. *See Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla. 1984). Kime is not personally liable for the actions of First American since the corporate veil is not pierced.

Plaintiff, R.W. Cuthill Jr's, Complaint for avoidance and recovery of transfers pursuant to 11 U.S.C. §§ 544, 548 and 550 is due to be **GRANTED**.

### *AMENDED ORDER AS TO CASE NUMBERS*

This matter came on the Plaintiff, R.W. Cuthill Jr.'s, Complaint for avoidance and recovery of transfers pursuant to 11 U.S.C. §§ 544, 548 and 550. After reviewing the pleadings and evidence, and hearing live testimony and arguments of counsel, and in conformity with the **Memorandum Opinion** entered contemporaneously herewith, it is

**ORDERED, ADJUDGED and DE-CREED** that **JUDGMENT** is entered in favor of the Plaintiff, R.W. Cuthill, Jr., Trustee and against Defendant Harold James Kime pursuant to 11 U.S.C. §§ 544, 548 and 550 for receipt of fraudulent transfers from January 15, 1997 until August 8, 2000 in the amount of $46,103.85; and it is further

**ORDERED, ADJUDGED and DE-CREED** that JUDGMENT is entered in favor of the Plaintiff, R.W. Cuthill Jr., Trustee and against Defendant First American Life and Health Insurance Corporation pursuant to 11 U.S.C. §§ 544, 548 and 550 for receipt of fraudulent transfers from January 15, 1997 until August 8, 2000 in the amount of $146,389.16.